SYMINGTON-ANDERSON CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4918.    Promulgated September 19, 1927.

1. Evidence *held* not to establish that a contract with the Government to manufacture 3-inch artillery guns on the basis of cost plus a fixed sum per gun, which contract could be canceled by the Government at any time, had a fair market value.

2. Profit from such contract *held* to have been derived on a cost-plus basis, within the provisions of subdivision (d) of section 327 of the Revenue Act of 1918.

3. The assets paid in to the corporation on organization were acquired by the owners without cost. *Held* that under section 331 of the Revenue Act of 1918 petitioner had no invested capital at the time of organization.

4. Assessment under section 328 denied.

*Robert P. Smith, Esq.,* for the petitioner.
*Joseph K. Moyer, Esq.,* for the respondent.

This is an appeal from the determination of a deficiency in income and profits tax for the calendar year 1918 in the amount of $76,174.96, arising from the denial of a claim for the abatement of a jeopardy assessment in that amount. It is alleged that the respondent erred in determining the tax liability of the petitioner for the year 1918 in (1) determining that more than 50 per cent of the income received by petitioner in 1918 was derived from cost-plus Government contracts and refusing to compute the tax under the provisions of sections 327 and 328 of the Revenue Act of 1918; (2) failing to determine any statutory invested capital under the provisions of section 326 of the Revenue Act of 1918, and in computing the tax under section 302 of said Act instead of section 301 or 328; (3) failing to allow as a deduction from income, depreciation or a deduction in lieu thereof of the value of Contract G. C. 102.

### FINDINGS OF FACT.

The petitioner is a Maryland corporation with its principal offices at Baltimore, Md. It was organized on or about July 21, 1917, with 10,000 shares of stock without par value. It was formed for the purpose of the manufacture of ordnance. On April 19, 1917, L. M. Vauclain, the Chairman of the Artillery Committee of the Council of National Defense, wrote to T. H. Symington Co. as follows:

The Government of the United States desires a large number of small calibre Field and Naval Guns, ranging from 3″ in diameter to 6″ in diameter, the greater number will naturally be of the smaller size, namely 3″. The length of these guns will range from the Army Field Guns, about 85″ long, to the Anti-aircraft Guns, about 170″ long.

The Government will provide an ample supply of gun forgings, rough machined and heat treated, to meet their requirements, delivery of the same beginning in about ninety days.

It is desired to create a capacity for machining and completing these guns ready for service. It is further desired that you create such additional facilities as you may require in addition to those you now possess to perform a percentage of the total work required.

The Committee will, therefore, be pleased to receive from you a proposition:

FIRST For doing all the work that may be required to finish each gun completely and ready for service.

SECOND For doing all the work as above excepting the breech manufacture.

THIRD Omitting such other details of the gun manufacture as in your judgment might be unwise for you to undertake.

Inasmuch as this matter is of the utmost importance and must be decided promptly, a personal interview is desired within the next ten days. Will you kindly telegraph when you may be expected. An early reply to the Secretary, Mr. Benedict Crowell, Room 956, Munsey Building, Washington, D. C., will be appreciated.

In response to this letter Symington went to Washington and had an interview with Vauclain. He informed Vauclain that the T. H. Symington Co. could not undertake any further work, and was told that they were interested in him, rather than his company, on account of his experience and abilities and financial standing.

T. H. Symington was a mechanical engineer and a manufacturer of many years' experience. In 1917 and for some years prior thereto, he had been engaged in manufacturing special machinery for the production of artillery ammunition and also in the manufacture of such ammunition. He had sold machinery to most of the large ammunition manufacturers in this country and had equipped two arsenals in Russia; one in Italy, and one in Australia. He had manufactured shrapnel for the allies under subcontracts for the Bethlehem Steel Co. and also for the Eddystone Ammunition Co., of which Vauclain was president. He was interested in various manufacturing companies and had had an extraordinary experience as a manufacturer of ordnance. This experience was known to Vauclain.

Vauclain urged that Symington undertake a contract to manufacture guns at a fixed price, but Symington refused and suggested that a contract on the basis of cost, plus a fixed profit per gun, was better for both parties. It was agreed that the contract would be of this nature. Symington further conferred with Major C. C. Jamieson in charge of the production of guns and with Colonel Rice in charge of the production of field artillery gun carriages.

There was associated with Symington, one M. H. Anderson as vice president of the Symington Machinery Corporation. Anderson had formerly been employed by the Bethlehem Steel Co. as superintendent of shops, in charge of the manufacture of shrapnel and guns. Anderson was a practical man who had had about 7½ years' experience in manufacturing ordnance. He had resigned from the Bethlehem Steel Co. in March, 1917, and was employed by Symington in April, 1917, on account of his experience in organization and the manufacture of ordnance. He was selected by Symington to take charge of the manufacture of guns under the contract being negotiated with the Government. Early in the negotiation he accompanied Symington to Washington where he was interviewed by Vauclain relative to his ability to handle the work and was found to be satisfactory.

On May 28, 1927, the War Department telegraphed Symington as follows:

Mr. T. H. Symington,
T. H. Symington Company,
Maryland Trust Bldg.,
Baltimore, Md.

How soon can you give us rough estimate of your expenditures for plant and equipment necessary for machining three inch field guns four per day please rush answer.

Benedict Crowell Secretary Committee on Army and Navy Artillery.

On June 11, 1917, the following telegram was sent to Symington by Jamieson:

T. H. Symington,
Barnum Leighton and Crouch St.,
Rochester

Will be glad to go into three inch gun question wednesday.

C. C. Jamieson.

On June 15, 1917, the Chief of Ordnance wrote Symington and Anderson as follows:

This Department will enter into a contract with you, as soon as appropriations become available, for machining and assembling three thousand 3-inch field guns, Model of 1916, delivery to begin within six months, and the contract to be completed by November 1, 1918, under the following general conditions:

1. The United States will pay the cost of the necessary land rental, buildings and equipment to manufacture these guns at an estimated rate of ten guns

per day; the sum to be expended therefor to be agreed upon between you and the Ordnance Department.

2. The plant to remain the property of the United States subject to removal at its option at the end of the contract or such subsequent contracts as may be entered into, such option to be exercised within thirty days after completion of final contract and actual removal to be completed within six months thereafter.

3. The United States to pay all cost of the manufacture of these guns, such cost to be determined by a firm of competent certified public accountants, or by some other method equally satisfactory to the contracting parties. The estimated unit cost of these guns machined and assembled, exclusive of land leased, plant, machine tools, jigs, fixtures and gauges for the purpose of estimating a fair fixed profit per gun is assumed at $2625.00, based on a cost of 74 cents per pound for the forgings.

4. The United States agrees to pay $390 per gun as profit under the assumption that the cost, including forgings as above, exclusive of land rental, plant, machine tools, jigs, fixtures and gauges is not more than $2625.00.

In case the cost as shown by the records is less than $2625, the saving or reduction in cost shall be divided between you and the United States on the basis of 33⅓% of such saving to you, and 66⅔ to the United States. In case the cost is greater than $2625.00, 20% of such excess cost shall be deducted from the fixed profit of $390, provided always that the fixed profit after such deduction shall not be less than $340. per gun delivered, it being understood that in case of excessive cost, the United States shall have the right to terminate the contract.

If after a reasonable time the daily output reached indicates that the contract will not be completed by November 1, 1918, the number of guns called for in the contract may be reduced to such number as will probably be completed by the date named.

The United States will make prompt monthly payment on account for all expenditures made, so as not to tie up your capital.

This Department would like further to have the option of placing an additional order for one thousand similar guns within sixty days, the rate of output to be increased in that case to twelve or more guns per day.

This letter is being mailed to you in duplicate, and in case a contract embodying the terms set forth above is satisfactory to you, your signed acceptance on one copy mailed to us will constitute a preliminary agreement.

On June 17, 1917, Jamieson telegraphed Symington as follows:

T. H. Symington,
T. H. Symington Co.,
Rochester

There will be some delay before letter can be signed and some modifications may be necessary. Will write fully tomorrow. Am returning to Washington to-night.

C. C. JAMIESON

On July 6, 1917, Symington wrote Jamieson as follows:

We have placed firm orders of approximately $500,000 for machinery for finishing guns, and will only be enabled to hold the secured deliveries by advising the machine tool builders of a number that will identify our work for the Government.

If consistent, can you wire me at Baltimore a number that can be given to our prospective order, so that the demand of the machine tool people can be met?

Please understand that this number that you will give me will in no sense commit your Department beyond its intention to place this contract with me; and please further understand that your non-compliance with the above will satisfy me that it is not possible for you to meet my request.

You will doubtless be interested to know that I have gotten together our complete working organization, and we are making excellent progress towards the manufacture of our gauges, jigs and fixtures.

If your present problem could be solved by our deeding to the Government, without reservation, a piece of land suitable for our purpose, I am ready to proceed.

On July 10, 1917, Jamieson replied by telegram as follows:

T. H. Symington,
Baltimore, Md.

    Have reserved order number G. O. one hundred and two

CROZIER, Chief of Ordnance
O. O. J.

On July 9, 1917, Jamieson wrote Symington as follows:

I am directed by the Chief of Ordnance to inform you that the Honorable Secretary of War has rendered a decision on the various questions involved in the execution of contracts which require the erection of buildings and extension to plant equipments for the production of the material called for therein.

This decision is such that this department is now in a position to proceed with definite orders for the machining and assembly of 3″ guns under discussion with your Company, and you are therefore entirely safe to proceed with the purchase of the necessary machine tool equipment, and with the preparation for the purchase of land for the erection of buildings for this purpose. A definite order in anticipation of the execution of the formal contract will be given you during the present week.

In order that this office may have definite information as to the estimated expenditure involved, we have already asked you for a list of the machine tools which it is anticipated will be required with the prices which you expect to pay for them. We also desire to examine this list in order to advise you whether the equipment is properly balanced for the production of the number of guns which you propose to manufacture.

It has been decided that such buildings as it shall be necessary to erect for the execution of contracts are to be temporary in character. By this is meant that they should be no more permanent than necessary for their purpose, and of a character that will not permit of a just charge of permanency.

For your information we are enclosing a definition of what we regard as temporary construction. This definition you will note leaves the actual details with reference to the construction very largely to the contractor, but we will appreciate receiving a sketch of your proposed construction.

On July 19, 1917, Jamieson wrote Symington as follows:

In connection with order from this office, G. O.–102 for 3-inch Field Guns, you are authorized to proceed with the construction of buildings in accordance with plans submitted this day and approved by the undersigned; also to

proceed with the purchase of machinery and equipment in accordance with your letter of July 19th and the exhibits attached thereto, dated July 17th and 18th.

On July 27, 1917, Lieutenant Colonel Hoffner of the office of the Chief of Ordnance wrote Symington as follows:

1. Referring to previous correspondence with you on the subject and to the provisions of section 120 of the Act of Congress relating to National Defense, approved June 3, 1916, and other laws of the United States and the Executive Orders of the President of the United States, or heads of its departments under which the requirements of advertisements for proposals are dispensed with, I am directed by the Chief of Ordnance to hereby give you an order to erect temporary buildings and purchase equipment which will enable you to machine and assemble three thousand (3,000) 3-inch field guns, at the rate of ten guns per day of twenty-four hours. Specifications for these guns will be furnished in connection with an order to be placed with you as soon as funds become available.

2. The cost of buildings and equipment, including small tools, jigs, fixtures and gauges, is not to exceed two million two hundred thousand dollars ($2,200,000). This plant, at the termination of the contract, or any subsequent contract which may be entered into with you, is to remain the property of the United States, subject to removal at its option.

3. Payment of at least ninety percent (90%) of the cost of buildings and equipment is to be made you monthly as incurred. Payment for the remainder to be made upon completion of buildings and installation of equipment.

4. In accepting this order you are also to agree to accept an order for the following, which will be placed in sufficient time to permit you to make deliveries as stated below. This order will be placed under the provisions of section 120 of an act of Congress relating to National Defense, approved June 3, 1916, under which the requirements of advertisements for proposals are dispensed with, an extract copy of which is enclosed herewith:

Machine and assemble three thousand (3,000) 3-inch field guns, Model of 1916, in accordance with Ordnance Office drawings Nos. 52–76–1 to 10, inclusive, revisions of June 14, 1917. Spare parts as listed below to be in accordance with Ordnance Office Drawing No. 27–8–1, revision of May 21, 1917, copies of which drawings are attached hereto. Forgings for gun body and breech block to be supplied you by the United States at such times as will enable you to make deliveries:

*Spare Parts*

  750 Breech mechanisms complete.
3000 Firing pins.
3000 Firing pin springs.
3000 Firing spring shoes.
3000 Hand fuze setters with covers.
3000 Sears.
3000 Sear springs.
3000 Trigger arms—should read " Firing Arms " in drawing.
3000 Trigger shaft detents with split pins.
3000 Catch springs.
3000 Closing springs.
6000 Extractor Plun. springs.
3000 Latch springs.

5. The serial numbers of the guns referred to herein will be 619 to 3618, inclusive.

6. Delivery, f. o. b. cars your plant, Rochester, N. Y., of the guns referred to herein is to be made at the rate of ten (10) guns per day, beginning on or before January 1, 1918, the entire order to be completed by March 1, 1919. If, after a reasonable time the daily output indicates that the order will not be completed by March 1, 1919, then it may be reduced to such number of guns as will be completed by that time.

7. The order referred to herein is to carry with it an option of placing at any time during the life of said order, and up to within sixty (60) days of its completion, an additional order for guns. If, after completing said order, the United States wishes to continue the manufacture of guns, you are to continue to operate the plant:

8. The guns referred to herein will be subject to inspection and acceptance before delivery.

9. Payment for the entire cost of machining and assembling these guns will be made as follows: At least ninety percent (90%) to be paid you monthly as incurred. The remainder and your profit to be paid you on completion and delivery of the guns and to be included in the next monthly payment after such completion and delivery. The term "cost" whenever used in the order referred to herein is understood to mean cost as defined in the "Definition of 'Cost' Pertaining to Contracts", issued by the Chief of Ordnance, United States Army, June 27, 1917, copy of which is enclosed herewith.

10. The estimated cost per gun with forgings, at seventy-four cents (74¢) per pound, and including cost of spare parts and preparation for shipment, is two thousand six hundred twenty-five dollars ($2625). On this basis you will be paid a fixed profit of three hundred ninety dollars ($390) per gun. If the cost is less than the above estimate, you are to be paid an extra profit of 33⅓ percent of the difference between the estimated cost and the actual cost, but a reduction in the cost of forgings is not to benefit you in this extra profit plan.

11. You will be supplied, by this Department, with one set of master gauges; all working gauges, inspection gauges, and star gauges to be provided by you.

12. It is agreed that, if owing to a cessation of hostilities or the termination of the war, or for any other reason, it should develop that the United States will not require all or any of the articles or material herein contracted for, then upon due notice the United States may cancel this agreement. It is further agreed that in the event of such cancellation the United States shall reimburse the manufacturer for all authorized expenditures incurred, and obligations outstanding in connection with this contract, up to the date of such notice. It is also agreed that the United States shall pay the fixed profit on all articles completed and accepted, and a profit upon the cost of the work done on those articles in process of manufacture which shall be based on the same percentage as the profit on completed articles. It is further agreed that all unfinished articles, other material, the plant and equipment, shall remain the property of the United States subject to removal at its option.

13. A formal contract covering the order referred to herein will be prepared in this office and forwarded to you for execution. It will contain a paragraph to the effect that the Eight Hour Act, approved June 19, 1912, will apply, subject to the modifications contained in the Executive Order of March 24, 1917, copy of which is enclosed herewith, and such other usual provisions as may be required by the Chief of Ordnance, United States Army. It is suggested that

if you have any doubt as to the acceptability of these provisions, you make inquiry to this office in regard thereto.

14. Notification of your acceptance of this order is requested.

Such letter was improperly addressed to the T. H. Symington Co., having reference to the negotiations theretofore conducted with Symington personally.

At the first meeting of the incorporators and board of directors of The Symington-Anderson Co., on August 2, 1917, T. H. Symington was elected president and M. H. Anderson vice president and general manager. The minutes of this meeting recited in part as follows:

Mr. T. H. Symington submitted to the meeting the following letter from Major Jamieson:

Mr. T. H. SYMINGTON,
          *Rochester, N. Y.*

DEAR SIR:—

Subject: Contract for 3-inch field Guns. G. C.–102

In connection with order from this office, G. C.–102 for the manufacture of 3-inch field guns, I am directed by the Chief of Ordnance to authorize you to proceed with the construction of buildings in accordance with plans submitted this day and approved by the undersigned; also, to proceed with the purchase of machinery and equipment in accordance with your letter of July 19th and the exhibits attached thereto, dated July 17th and 18th.

          Very truly yours,

                              CHAS. C. JAMIESON,
                              *Major, U. S. Army, Ret'd.*

and offered to sell and assign all his rights under the contract referred to in said letter to the Company in return for the issue to him or his nominees of ten thousand shares of its capital stock.

On motion, the offer was unanimously accepted.

A form of contract, intended to assist in securing the best possible organization, was then submitted, unanimously approved, and ordered signed and spread on the minutes of this meeting. It is as follows:

AGREEMENT made at Rochester, N. Y., this 2nd day of August 1917, between THE SYMINGTON-ANDERSON Co., party of the first part, T. H. SYMINGTON, of Rochester, N. Y., party of the second part, and M. H. ANDERSON, of South Bethlehem, Pa., party of the third part.

WHEREAS, The Symington-Anderson Co., through T. H. Symington, has secured from the United States Government an order for the erection at Rochester, N. Y., of a plant to machine and assemble 3,000 75 m/m Field Guns;

AND WHEREAS, in the opinion of all the parties to this agreement, it is essential, in order to secure the most competent men and so secure the best results for the Government, that the organization of the Company should have the incentive of an interest in the business in addition to their regular salaries;

THIS AGREEMENT WITNESSETH, that The Symington-Anderson Co. hereby agrees with the other parties hereto to distribute among the organization of the Company twenty (20) per cent. of the net profits from said order for 3,000 Field Guns, and an equal percentage of the net profits from all future orders placed with the Company by the Government, to such individuals and in

11340°—28———12

such proportion as may be fixed by unanimous agreement of a committee consisting of T. H. Symington, M. H. Anderson and C. H. Lynn, any vacancy occurring in said committee, for whatever cause, to be filled by agreement of its two remaining members.

Seventy-five hundred shares of stock were issued to T. H. Symington and twenty-five hundred shares were issued to M. H. Anderson as nominee. Anderson was selected by Symington as his nominee for what was considered his unusual ability and fitness to perfect an organization and get results. Five thousand shares of the stock originally issued to Symington were assigned by him to the T. H. Symington Co. for the financial assistance it had given and was to give.

Before the organization of the Symington-Anderson Co. there was an agreement between Symington and Anderson that Anderson was to perform certain duties in obtaining men and getting together an organization to perform this contract, and, if and when the company was formed, Anderson was to receive a certain percentage of the stock for his services.

Prior to August 2, 1917, plans for the buildings required to house the equipment had been prepared; lists of requirements in machine tools, jigs, templets, and equipment had been made out; the working organization had been gotten together and commitments of approximately $500,000 for machinery for finishing guns ,had been made. During this time Anderson, who was actively engaged in .the work, received a salary as vice president of the Symington Machinery Corporation.

A formal contract for the construction and equipment of the plant was executed by and between the Symington-Anderson Co. and the contracting officer for the Government August 31, 1917. The number assigned to it was G. C. 102.

An order to machine and assemble three thousand 75 m/m guns, dated November 23, 1917, was addressed to the Symington-Anderson Co. by the Ordnance Department of the United States Army. The number assigned to this order was G–964–341–C. It was performed in part by petitioner and deliveries of guns thereunder were made in 1918. No formal contract for this order was executed. With the exception of some later drawings this order was substantially the same as the draft contained in letters of June 15, 1917, and July 27, 1917. It provided for payment to the contractor as follows:

3. You will be paid the entire cost of producing the guns herein ordered plus a fixed profit of three hundred and ninety dollars ($390.00) for each gun accepted by the United States and delivered by you.

4. This fixed profit may be added to in the following manner. Adding the cost of materials furnished by the United States, which is hereby fixed at Nine

Hundred and Sixty dollars ($960.00), the estimated cost of spare parts, the estimated cost of preparation for shipment and the estimated cost of machining and assembling, the estimated average cost per gun is Two Thousand Six Hundred and Twenty-five dollars ($2,625.00). On completion of this order the actual average cost per gun will be determined by adding to the actual cost of machining and assembling and the actual cost of the spare parts and preparation for shipment, the sum of Nine Hundred and Sixty dollars ($960.00) per gun, and if the actual average cost is less than the estimated average cost, you will receive in addition to the fixed profit provided for in paragraph three of this order, one third of the difference between the actual average cost and the estimated average cost.

5. Payments will be made as follows:—

(a) The cost as incurred, of producing the guns will be paid from time to time but at least monthly.

(b) Ninety-five per cent (95%) of the fixed profit will be paid monthly for all guns accepted and delivered the previous month or months.

(c) The remainder of the fixed profit and any additional profit which may be due under the provisions of paragraph four of this order will be paid at the completion of this order.

After production of guns had begun the order was changed to provide for the manufacture of the French 75 m/m gun in place of the American gun. This resulted in additional expense and slowed down production. Six hundred eighty-seven guns were manufactured by petitioner under this order in 1918. Petitioner's net income in 1918 was $324,874.85 without allowance for any deduction for exhaustion of its contract. Claim for loss on account of cancellation was made by the Symington-Anderson Co. under the provisions of the Act of Congress approved March 2, 1919, entitled, "Act to provide relief in case of contracts connected with the prosecution of the war and other purposes."

The Commissioner determined no invested capital for the petitioner, refused to compute the profits tax under section 328 of the Revenue Act of 1918, refused to allow any deduction for exhaustion of the Government contract, and computed the profits tax under section 302 of the Act.

OPINION.

PHILLIPS: Petitioner contends that upon organization it acquired, in exchange for its capital stock, a contract to manufacture 3,000 guns which had a fair market value of $1,000,000, that this represented the cost to it of such contract, and that it is entitled to a deduction for the exhaustion of such cost at the rate of $333.33 per gun manufactured. The respondent contends that all that was assigned to the corporation at organization was a contract to construct a building and install suitable machinery to produce guns, that at that time no order for guns had been placed with Symington and that

such order was thereafter placed directly with the petitioner; further, the Commissioner contends that if we hold there was a contract to manufacture guns, it cost the petitioner nothing.

Without determining whether there was in fact any contract, we are of the opinion that no value or cost has been established. Although both Symington and Anderson testified that the contract had a value of $1,000,000 when transferred to the corporation, it appears from other testimony given by them that this was merely another way of stating that if all the guns were manufactured, the minimum profit would be $1,000,000. It appears, however, that the Government reserved the right to cancel at any time, and did in fact cancel after the Armistice, after only about one-third of the guns called for had been finished. In the case of cancellation, the profit stopped, except as to the work already done. Anyone considering the purchase or sale of such a contract could not fail to recognize that the estimated profit was uncertain.

It is contended that the provision of the contract giving to petitioner one-third of the saving resulting from a cost less than $2,625 per gun gave added value to the contract. It is in evidence that guns were produced for less than this amount, despite a costly change from American to French 75 m/m guns. No doubt the officers of petitioner hoped, through the unusual mechanical skill of Symington and Anderson, to realize on this clause, but the possibility at the time the contract was under negotiation does not seem to have been very encouraging, for Symington testifies:

Q. Were you told by the Government's Agent at Washington, with whom you dealt, what the Arsenal cost of manufacturing similar guns was?

A. I was told that that was the estimate based on cost and studies in the production of that gun, and I was further told that the cost of $2625 was made after due consideration was given to the fact that a large number of guns could be produced at a much less cost than a few guns, so that my impression was and I so told them that they had made a very low figure for me to shoot at, to which they agreed.

It was because Symington and Anderson were known to be capable of carrying out the contract that it was awarded to them. We do not question for a moment that, combined with their financial standing, their skill and their ability to secure and hold an adequate organization, the contract promised to be valuable. Standing alone as a contract, we doubt if there was any considerable value, for the contract had just been negotiated in a transaction between two parties dealing at arm's length. The Government was seeking such production and presumably any one who could have assured the officials of his ability to perform such a contract might have obtained one. It

is not to be assumed, and we believe that Symington and Anderson would be the last to ask us to assume, that they obtained something from the Government that others could not have obtained if able to perform. The principal asset the petitioner possessed was, we are convinced, the services of these two men and the organization they developed. It was this which led the officials to give them the contract and, with such a situation existing, the petitioner would undoubtedly have been in a position to obtain such a contract direct, had there been none to assign to it.

We are of the opinion that the petitioner is not entitled to any deduction for exhaustion of the contract.

We come then to consider the claim for assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918. Section 327 provides as follows:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;

(b) In the case of a foreign corporation;

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock or for stock and bonds and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6. 1917, and November 11, 1918, both dates inclusive.

The Commissioner denied that petitioner fell within this section, claiming that more than 50 per cent of its income was derived from cost-plus contracts. Petitioner asserts that the contract here involved contemplated a fixed profit per gun and a share in the savings, is not a cost-plus contract as such term is generally used, that there are abnormalities of income and invested capital which bring it within subdivision (d) of this section and that in any event it falls within subdivision (a). In his brief the Commissioner contends that

14 8 U. S. BOARD OF TAX APPEALS REPORTS. (132)

if there is a cost-plus contract, petitioner can not have his tax computed under section 328. In this he is clearly in error, since the provision relating to cost-plus contracts is contained only in subdivision (d) of the section and by its express provisions is confined in its operation to that subdivision. The other subdivisions are free of any such limitation.

Section 331 of the statute provides as follows:

In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: *Provided,* That if such previous owner was not a corporation, then the value of any asset so transferred or received shall be taken at its cost of acquisition (at the date when acquired by such previous owner) with proper allowance for depreciation, impairment, betterment or development, but no addition to the original cost shall be made for any charge or expenditure deducted as expense or otherwise on or after March 1, 1913, in computing the net income of such previous owner for purposes of taxation.

None of the assets, either tangible or intangible, which were paid in to the corporation either for stock or otherwise cost Symington anything. Under the limitations of this provision the corporation apparently had no invested capital when organized. The invested capital can therefore be determined as nonexistent, and the petitioner does not fall within subdivision (a).

In the petition, it is alleged that the Commissioner erred in determining that the contracts in question were cost-plus Government contracts, apparently because petitioner wished to argue that it fell within subdivision (d) of the Act. In its brief, the whole argument is with respect to subdivision (a) and we are without any help in determining what Congress meant by the words "cost-plus." Reference to standard and law dictionaries and to the committee reports on the Act throw no light on their meaning. Texts on accounting, however, use this phrase to distinguish from the "lump-sum" basis. Here the petitioner was to recover its costs in any event and, in addition, a further amount. The word "plus" indicates addition, and the phrase "cost-plus" would ordinarily include what we have here; a provision for the payment of cost and something additional. We conclude that the income was derived on a cost-plus basis from a Government contract made between April 6, 1917, and November 11, 1918, and that the petitioner is not entitled to have its tax com-

puted under section 328 by reason of any abnormal conditions affect-ing its income or capital.

It is not contended that petitioner falls within either of the other subdivisions of section 327.

Reviewed by the Board.

*Decision will be entered for the respondent.*